UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JIMMIE L. MCRAE,

                          Plaintiff

               - v -                           Civ. No. 9:02-CV-00291
                                                         (GLS/RFT)

KATHLEEN REYNOLDS, as Executrix of the
Estate of Edward F. Reynolds, Deceased Defendant,

                        Defendant.
_____

APPEARANCES:                                      OF COUNSEL:

JIMMIE L. MCRAE
Plaintiff, *Pro Se*
95-B-0784
Mid-State Correctional Facility
P.O. Box 2500
Marcy, New York 13403

HON. ELIOT SPITZER                        JAMES SEAMAN, ESQ.
Attorney General of the State of New York     Assistant Attorney General
Attorney General's Office
New York State Department of Law
The Capitol
Albany, New York 12224

**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION and ORDER

     Plaintiff Jimmie McRae brings this *pro se* civil rights action pursuant to 28 U.S.C. § 1983. In his Amended Complaint, McRae asserts that Defendant's decedent, Edward R. Reynolds, former Superintendent of Mohawk Correctional Facility, violated his civil rights when he placed McRae in a special housing unit (SHU) without first affording McRae any due process protections, in

violation of the Fourteenth Amendment. Dkt. No. 42, Am. Compl. Plaintiff remained confined in SHU for sixty (60) days at which point he was transferred to another facility. *Id*. Presently pending before this Court is Defendant's Motion to Dismiss the Amended Complaint, pursuant to FED. R. CIV. P. 12(b)(6).[1] Dkt. Nos. 43-44 & 50. Plaintiff opposes the Motion. Dkt. Nos. 49 & 52. For the reasons that follow, it is recommended that Defendant's Motion be **denied**.

## I. PROCEDURAL BACKGROUND

A recitation of the relevant procedural background for this case is warranted.[2] On February 28, 2002, Plaintiff commenced the instant action complaining of events that occurred in 2000 while he was incarcerated at Mohawk Correctional Facility. Dkt. No. 1, Compl. On March 14, 2002, this Court granted Plaintiff's Application to Proceed *In Forma Pauperis* and directed the Marshals to effectuate service of the Complaint on the named Defendant, Edward Reynolds. Dkt. No. 4. An acknowledgment of that service was filed with the Clerk of the Court on April 8, 2002. Dkt. No. 6.

On May 23, 2002, James Seaman, Esq., Assistant Attorney General and counsel for Defendant, filed a Notice of Suggestion of Death for Defendant Edward Reynolds, pursuant to FED. R. CIV. P. 25, as well as a Motion to Dismiss the Complaint on the grounds that the action could not be maintained against a deceased party and for lack of proper service. Dkt. Nos. 8-10. McRae, in opposing the Motion, Cross-Moved to Substitute the executrix of Reynold's estate as the Defendant. Dkt. Nos. 12 & 17. On December 11, 2002, this Court granted McRae's Cross Motion for Substitution and directed the Marshal to effectuate service upon Kathleeen Reynolds as executrix of

---

[1] The Motion was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Such recitation is warranted in light of the transfer of this case from District Judge Kahn to District Judge Sharpe.

the estate of Edward R. Reynolds. Dkt. No. 19. We further recommended that the Defendant's Motion to Dismiss be denied in light of the substitution. *Id*. On January 17, 2003, that Report-Recommendation and Order was adopted in its entirety by District Judge Lawrence E. Kahn. Dkt. No. 23.

Thereafter, Kathleen Reynolds accepted service of process on behalf of the estate (Dkt. No. 22) and on February 18, 2003, she initiated a Motion to Dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(6). Dkt. Nos. 24-25 & 32. Plaintiff opposed that Motion. Dkt. Nos. 30 & 34. On September 3, 2003, this Court issued a Report-Recommendation and Order, wherein we recommended Defendant's Motion to Dismiss be granted in part as to Plaintiff's First Amendment Retaliation and Fourteenth Amendment Equal Protection Claims. Dkt. No. 38. With regard to Plaintiff's Fourteenth Amendment Due Process Claim, however, this Court recommended denial of Defendant's Motion in order to give Plaintiff an opportunity to amend his Complaint and provide specific factual allegations as to how his sixty (60) day confinement in SHU was atypical and significant. *Id*. On September 29, 2003, after hearing Defendant's Objections to said Report, Judge Kahn accepted the recommendations in their entirety and similarly ordered Plaintiff to amend his Complaint in accordance with this Court's directives. Dkt. No. 40. On October 1, 2003, Plaintiff filed an Amended Complaint. This Amended Complaint is now the basis of the third Motion to Dismiss.

## II. FACTUAL BACKGROUND

The following facts are derived from the Amended Complaint, which, on a motion to

dismiss, this Court must construe as an accurate depiction of the events.[3]

On June 1, 2000, Defendant's Decedent, Edward Reynolds, then Superintendent of the Mohawk Correctional Facility, placed McRae in a special housing unit (SHU) without first providing a hearing or notification of any charges. Dkt. No. 42, Am. Compl. at p. 1; Dkt. No. 1, Compl. at ¶ 6, Attach. Statement of Facts.[4] It appears, by his own admission, that McRae was placed in SHU after the administration at Mohawk Correctional Facility discovered that McRae's security classification had been misstated during his incarceration at Auburn Correctional Facility, and prior to his transfer to Mohawk, as medium instead of maximum. Compl. at ¶ 6, Attach; Compl., Ex. B.[5] This error in classification allowed for McRae's transfer from Auburn, a maximum security prison, to Mohawk, a medium security prison. Compl., Ex. A.[6] The mistake was discovered during McRae's routine quarterly review with his prison counselor. *Id*.[7] The counselor caught the error and resubmitted McRae's case to the Classification and Movement Office of the New York State Department of Correctional Services (DOCS) for review. *Id*. It was thereafter determined that McRae should have been incarcerated in a maximum security prison. *Id*. The

---

[3] Since Plaintiff was directed to file an amended complaint that addresses the sole issue of his confinement, the Court will recite any relevant facts included in, or appended to, his original Complaint when necessary. We find this prudent in light of Plaintiff's *pro se* status despite the fact that amended complaints typically replace any previous pleading *in toto*. Our reference to these facts, previously asserted in the original Complaint and, to some extent, referenced in Plaintiff's Amended Complaint, only serve to paint a clearer picture of what transpired and will not prejudice the Defendant in any manner as she appears to similarly refer to such facts in her statement of the case and has similarly attached Plaintiff's original pleading as an exhibit in support of her current Motion.

[4] The paragraphs contained in the statement of facts attached to the Complaint are unnumbered, thus, any reference to these sets of facts will simply be referred to as "Dkt. No. 1 at ¶ 6, Attach."

[5] Lt. from McRae to Ms. Rosher, Correction Counselor, dated June 22, 2000.

[6] Lt. from Ronald Nelson, Deputy Superintendent-Programs, Auburn Correctional Facility, dated Aug. 29, 2000 ("Nelson Letter").

[7] Lt. from James A. Mance, Deputy Superintendent-Programs, Mohawk Correctional Facility, dated June 19, 2000 ("Mance Letter").

decision to reclassify McRae to maximum security, and accordingly transfer him to a maximum security prison, was made by the Central Office and not by the facility, and further, his security status had nothing to do with any misbehavior reports or grievances filed. Compl., Ex. A, Mance Letter.[8] McRae was later informed that his classification was, and had always been, "maximum" and that at the time of his transfer from Auburn, he was erroneously submitted as "medium" due to his improved disciplinary record. Compl., Ex. A, Nelson Letter. However, such a change was premature as his actual status had not changed. *Id*. McRae was then told that if he continued his good behavior he may become eligible for medium classification. *Id*.

On June 1, 2000, Edward Reynolds ordered McRae's confinement in SHU. Am. Compl. at p. 1. McRae spent sixty (60) days in SHU at Mohawk Correctional Facility and was never afforded notice of any charges pending against him nor was he provided any hearing in connection with such confinement. *Id*.; Compl., Attach. During his confinement in SHU, Plaintiff was stripped of all privileges, his property was confiscated wherein he was deprived of the necessities to maintain a healthy life style, he was forbidden from speaking to other inmates unless he was in the recreation area, he was only permitted two five-minute showers per week, and he could not make any telephone calls. *Id*. Also during his confinement in SHU, the prison guards subjected the inmates to degradation ranging from verbal insults to urinating and ejaculating in inmates' food.[9] *Id*. at p. 2. Such officers also interfered with correspondences, especially grievances. *Id*. Finally, while in

---

[8] *See also* Compl., Ex. B (letter from McRae to his prison counselor with a notation at the bottom from the counselor indicating that the reclassification of his security status had nothing to do with his filing of a grievance).

[9] In his Amended Complaint, McRae states, "[t]he Correction Officer's was [sic] very degrading from insults when you asked them for something to urinating and ejaculating in inmates [sic] food." Am. Compl. at p. 3. Defendant contends that Plaintiff has not specifically stated that he was a target of such degradation. However, a reasonable inference may be drawn from Plaintiff's pleading that he indeed was the target of such alleged abuse.

-5-

SHU, Plaintiff suffered from high blood pressure and experienced difficulty in obtaining his medication. *Id*.

In light of the procedural background, recited above, Plaintiff's sole remaining claim is that his due process rights under the Fourteenth Amendment were violated. All other claims were previously dismissed and, thus, are not properly before the Court. As such, any reference in Plaintiff's Amended Complaint to equal protection or retaliation claims, pursuant to the Fourteenth and First Amendments, respectively, shall not be considered by this Court in making recommendations.

### III. DISCUSSION

#### A. Motion to Dismiss Standard

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997). On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6 (1963). Thus, the plaintiff need not necessarily

plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id*.; *see also Wheeldin v. Wheeler*, 373 U.S. 647, 648 (1963) (inferring facts from allegations of complaint). In construing the complaint favorably to the pleader, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *see also Scheuer v. Rhodes*, 416 U.S. at 236; *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994). In spite of the deference the court is bound to pay to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

### B. Due Process Claim

To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id*.

#### *1. Liberties created under the Due Process Clause*

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.'" *Arce v. Walker*, 139 F.3d at 333 (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). The Due Process clause does not protect against "every change in the conditions of

confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner*, 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[] the sentence in . . . an unexpected manner." *Id*. at 484 (quoted in *Arce v. Walker*, 139 F.3d at 333).

In the case at bar, Plaintiff's transfer to a special housing unit, without regard for the type of confinement McRae was subjected to, *i.e.*, administrative or disciplinary, does not implicate a liberty interest under the Due Process Clause because the "transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. at 468 (quoted in *Sealy v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999)).

### 2. Liberties created by the State

State statutes and regulations may also confer liberty interests on prisoners. *Arce v. Walker*, 139 F.3d at 334 (citing *Kentucky Dep't of Corr.*, 490 U.S. at 460). Prior to the Supreme Court's decision in *Sandin v. Connor*, 515 U.S. 472 (1995), the struggle to define the contours of state created liberty interests rested with the district courts, who would engage in the arduous task of scrutinizing state statutes and administrative regulations to determine whether the state had "gone beyond issuing mere procedural guidelines and had used 'language of an unmistakenly mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates.'" *Lee v. Coughlin*, 26 F. Supp. 2d 615, 629 (S.D.N.Y. 1998) (quoting *Hewitt v. Helms*, 459 U.S. at 471-72); *see also Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999). Such methodology, according to the *Sandin* Court, produced two undesirable effects:

> First, it create[d] incentives for States to codify prison management procedures in the interest of uniform treatment. . . . Second, the *Hewitt* approach [] led to the involvement of federal courts in the day to day management of prisons, often squandering judicial resources with little offsetting benefit to anyone.

*Sandin*, 515 U.S. at 482.

Recognizing the fallacy of such methodology, the Supreme Court held that states may still create liberty interests for inmates in remaining free from solitary confinement, thereby requiring some process precede the segregated confinement, however, such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *see also Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citing *Sandin*, 515 U.S. at 484); *Welch v. Bartlett*, 196 F.3d at 392.  Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an atypical and significant hardship.

After *Sandin*, to assert a state created liberty interest, an inmate must establish that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. at 484, and (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

### *a. First element----Atypical and Significant*

The first element, focusing on whether the conditions of a segregation amounted to an atypical and significant hardship, "turns on the <u>duration</u> of the segregation and a <u>comparison with the conditions</u> in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d at 336 (emphasis added) (citations omitted).  In determining whether a liberty interest has been

affected, the Second Circuit requires district courts to "undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions." *Alvarez v. Coughlin*, 2001 WL 118598, at * 4 (N.D.N.Y. Feb. 6, 2001) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997); *Miller v. Selsky*, 111 F.3d 7, 9 (2d Cir. 1997); *Sealy v. Giltner*, 116 F.3d at 51-52 and; *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)). More specifically, we are directed to evaluate, in addition to the duration of the actual confinement, "the extent to which the conditions of the [ ] segregation differ from other routine prison conditions."[10] *Wright v. Coughlin*, 132 F.3d at 136; *see also Brooks v. DiFasi*, 112 F.3d at 49; *Spaight v. Cichon*, 1998 WL 852553, at **1 (2d Cir. Dec. 8, 1998) (unpublished opinion) (reversing district judge's dismissal of plaintiff's due process claim because both he and the magistrate judge had failed to develop an adequate record of the detailed factual circumstances surrounding the challenged confinement). "The content of the *Sandin* standard of atypical and significant hardship is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." *Sealy v. Giltner*, 197 F.3d at 585.

In terms of the duration of the confinement, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999); *see also Ayers v. Ryan*, 152 F.3d 77, 83 (2d Cir. 1998) ("Whether or not a period of disciplinary confinement amounts to an atypical and significant

---

[10] In determining the extent to which the conditions of segregated confinement differ from ordinary prison conditions, "the court must assess the terms of [the] plaintiff's segregation, as well as the general conditions affecting the prisoner's quality of life such as 'the revocation of telephone or mail privileges or the right to purchase items otherwise available to prisoners, and the deprivation of exercise, medical care, adequate food and shelter, and other conditions that, if improperly imposed, could violate the Constitution.'" *Ramirez v. McGinnis*, 75 F. Supp. 2d 147, 151 (S.D.N.Y. 1999) (quoting *Jenkins v. Haubert*, 179 F.3d 19, 27-28 (2d Cir. 1999)).

-10-

hardship is a fact-intensive inquiry[.]"). The Second Circuit has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. *See Colon v. Howard*, 215 F.3d 227, 231-32 (2d Cir. 2000). Comparatively, the segregative sentences of 125-288 days are deemed to be "relatively long" and therefore necessitate "specific articulation of fact findings before the district court could properly term the confinement atypical or insignificant." *Sims v. Artuz*, 230 F.3d 14, 22, (2d Cir. 2000). Nevertheless, the Court of Appeals has suggested that "in cases involving shorter period of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation of its reasoning." *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) (cited in *Alvarez v. Coughlin*, 2001 WL 118598, at * 4). However, a confinement of less that 101 days could meet the *Sandin* standard on a more fully developed record. *Colon v. Howard*, 215 F.3d at 232 n. 5 (cited in *Taylor v. Rodriguez*, 238 F.3d 188, 195 (2d Cir. 2001)).

In reviewing the duration of McRae's confinement, we decline to find, as a matter of law, under these factual allegations and in light of the standard applied in procedural motion currently before the Court, that the duration of McRae's confinement by itself necessarily precludes a finding of atypical and significant hardship. *See Scott v. Albury*, 156 F.3d 283, 287-88 (2d Cir. 1998) (remanding case to district court for further fact finding where plaintiff was confined in keeplock for sixty (60) days).

Furthermore, in light of the sixty-day duration of Plaintiff's confinement, coupled with his allegations regarding the conditions he endured, the Second Circuit would require us to undertake a detailed factual finding regarding the conditions of his confinement as compared to other forms of segregated confinement and to the general population of inmates. Such factual findings, however,

would be an inappropriate undertaking in making a recommendation on the present motion before the Court.  "A more appropriate vehicle for resolution of this issue is a motion for summary judgment, where the [c]ourt may rely on matters outside the pleadings, including affidavits from persons with knowledge that address the conditions under which plaintiff was confined and how those conditions compared to conditions imposed on the general population and similar administrative confinements."[11]  *Withrow v. Donnelly*, 2004 WL 2047878, at * 2 (W.D.N.Y. Sept. 14, 2004) (prisoner confined for seventy-seven (77) days) (citing *Palmer v. Richards*, 364 F.3d 60, 66 (2d Cir. 2004)).

Thus, the very nature of the Motion precludes dismissal under the facts alleged because we are limited in our ability to compare the conditions of McRae's confinement to that of the rest of the prison population, segregated or otherwise.

### b. Second Element—State Created Liberty Interest

According to Second Circuit precedence, New York State has indeed created, by statute or regulation, a state-created liberty to be free from segregated confinement.  *See, e.g.*, *Sher v. Coughlin*, 739 F.2d 77, 81 (2d Cir. 1984).  While *Sandin* may have called into question the method courts undertook in reaching such conclusion, *Sandin* did not affect the validity of these decisions, but instead narrowed the due process protections to hardships that are atypical and significant. *Ramirez v. McGinnis*, 75 F. Supp. 2d 147, 153-54 (S.D.N.Y. 1999) (stating that prior cases

---

[11] Also note the case of *Alvarez v. Coughlin*, 2001 WL 118598, at * 4 (N.D.N.Y. Feb. 6, 2001), where the court was faced with the defendants' motion for summary judgment.  2001 WL 118598, at * 5.  Defendants, though acknowledging that conditions of confinement will vary from facility to facility, attached to their dispositive motion exhibits that analyzed the statewide special housing program in comparison to statewide general population policies.  *Id*.  In denying the defendants' motion, the court noted that it had insufficient evidence to compare the plaintiff's conditions since the generalized showing of typicality is insufficient given Second Circuit mandate to ascertain specific conditions of confinement.  *Id*.

determining that New York State has created liberty interests are affected by *Sandin* only with respect to further limiting classes of cases to those involving atypical and significant hardships); *see also Attens v. Leferve*, 891 F.2d 38, 40 (2d Cir. 1989) (holding that inmates have a liberty interest in remaining free from administrative keeplock). Further, while the Second Circuit has questioned the effect of *Sandin*'s denouncement of the *Hewitt*[12] approach of searching for mandatory language in assessing whether a state has created a liberty interest, they have not expressly found that prior cases determining that New York State has created liberties are overturned. *Compare Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (declining to resolve the issue of whether *Sandin* "may be read as calling into question the continuing viability of [Second Circuit] cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation.") *with Alvarez*, 2001 WL 118598, at * 6 (New York regulations do create protected liberty interest); *see also Ramirez v. McGinnis*, 75 F. Supp. 2d at 153 (citing *Gonzalez v. Coughlin*, 969 F. Supp. 256, 257 (S.D.N.Y. 1997); *Wright v. Miller*, 973 F. Supp. 390, 395 (S.D.N.Y. 1997) and; *Lee v. Coughlin*, 26 F. Supp. 2d 615, 632-33 (S.D.N.Y. 1998)).

The Second Circuit noted in *Sealy v. Giltner*, 197 F.3d 578 (2d Cir. 1999), that "the [Supreme] Court's recognition [in *Sandin*] that the states can create a protected liberty interest in freedom from restricted confinement (such as SHU) must mean that the *Hewitt* inquiry as to a substantive factual predicate has not been completely abandoned, but only limited to those instances where a finding of such a predicate results in confinement to conditions of atypical and significant hardship." 197 F.3d at 584. The *Sealy* Court further dismissed the notion, previously left unresolved in *Rodriguez*, that restricted confinement for administrative reasons could never

---

[12] *Hewitt v. Helms*, 459 U.S. 460 (1983).

implicate a protected liberty interest, since New York has established substantive factual predicates for many instances of administrative confinement. *Id.* (citing N.Y. COMP. CODE RULES & REGS. tit. 7, §§ 301.1-7 & 301.4(b). "If an inmate is to be placed in atypical confinement (considering both the conditions and the duration) after being determined, for example, to be a threat to prison safety, he should have some procedural due process surrounding the determination that he poses such a threat. *Id.* at 585.

In light of the above analysis, Plaintiff's Amended Complaint sufficiently meets the standard imposed by the Supreme Court and the Second Circuit in stating a due process claim arising out of segregated confinement to withstand Defendant's Motion to Dismiss. Thus, prior to being confined in SHU, McRae should have been afforded some procedural protections.

### *3. Due Process Protections*

Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Thus, in our case, assuming the presence of a liberty interest, a prisoner placed in administrative segregation must be provided "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001) (quoting *Hewitt v. Helms*, 459 U.S. at 476). "Notice" should be something more than a mere formality. *Benitez v. Wolff*, 985 F.2d 662, 665 (2d Cir. 1993). "The effect of the notice should be to compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away

-14-

vague charges set out in a misbehavior report." *Taylor v. Rodriguez*, 238 F.3d at 192-93 (quoting *McKinnon v. Patterson*, 568 F.2d 930, 940 n.11 (2d Cir. 1977)) (alteration in original). "Although the hearing requirement for placement in administrative segregation may be met by an 'informal, nonadversary' proceeding, *Hewitt* [*v. Helms*,] 459 U.S. at 476, it is a bedrock requirement of due process that such hearing be held 'at a meaningful time and in a meaningful manner,' *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976)." *Taylor v. Rodriguez*, 238 F.3d at 193.

Further, the type of confinement McRae was subjected to will aid in determining what process was due before such confinement was imposed. *See Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (stating that an analysis of the type of confinement is just as significant in determining the length of such confinement when assessing whether it is "atypical and significant"); *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir. 1997) (indicating the importance of distinguishing between the type of confinement when deciding whether the confinement was atypical).

In the case at bar, however, it is unclear from the record before the Court what type of confinement McRae was subjected to for sixty consecutive days. From Plaintiff's averments that he never received any misbehavior report setting forth disciplinary infractions nor a hearing, it would logically follow that he was not the subject of a disciplinary segregation. Given the fact that his retaliation claims have already been dismissed, we can draw the inference that his segregation was probably linked to his security classification, or rather, misclassification. Thus, it appears from the facts alleged that McRae's confinement was administrative in nature.

Section 301.4(d) of the regulations pertaining to the admission of inmates into administrative segregation states:

> Inmates assigned to administrative segregation status shall have such status reviewed

> every seven days for the first two months, and every 30 days thereafter, by a three-member committee consisting of a representative of the facility executive staff, a security supervisor, and member of the guidance and counseling staff. The results of such review shall be forwarded, in writing, to the superintendent for final determination.

N.Y. COMP. CODE R. & REGS. tit. 7, § 301.4(d).

At the very least, an inmate confined for administrative purposes (protective or otherwise) is entitled to minimal process consisting of "some notice of charges against him and an opportunity to present his view to the prison official charged with deciding whether to transfer him to administrative segregation." *Maityn v. Henderson*, 841 F.2d 31, 36 (2d Cir. 1988) (quoting *Hewitt v. Helms*, 459 U.S. at 476).

McRae was not afforded any notice as to why he had been separated from the population. Any protestations made were, in his estimation, either ignored or thwarted. Further, McRae has pled that he was denied certain amenities he would be entitled to had he been housed with the rest of the prison population or had been involuntarily admitted to protective custody.

Thus, in light of the above analysis, McRae has sufficiently stated a cause of action to defeat Defendant's Motion to Dismiss.

### C. Qualified Immunity

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Firzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng*, 858 F.2d at 895.

Qualified immunity analysis involves a three step inquiry. *See Harhay v. Town of Ellington*

*Bd. of Ed.*, 323 F.3d 206, 211 (2d Cir. 2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, a plaintiff has established a constitutional violation. *Id*. If yes, the court must then question whether the right in issue was clearly established at the time of the alleged violation. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). Finally, if a plaintiff had a "clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley*, 261 F. Supp. 2d 113, 125 (N.D.N.Y. 2003) (citing, *inter alia*, *Harhay*, 323 F.3d at 211); *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999).

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The only pleadings filed in the present case thus far are the Original and Amended Complaints. Defendant has not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather in her memorandum of law in support of her Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a . . . 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983); *see also McKenna v. Wright*, 2004 WL 2334909, at * 2 (2d Cir. Oct. 18, 2004) (quoting *Green*). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall*, 22 F. Supp. 2d 156, 162 (S.D.N.Y. 1998) (citing *Green v. Maraio*, 722 F.2d at 1019); *see also McKenna v. Wright*, 2004 WL 2334909.

The Second Circuit has further held that qualified immunity "turns on factual questions that

cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Ed.*, 313 F.3d 768, 793 (2d Cir. 2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004).

**WHEREFORE**, based on the foregoing, it is hereby

**RECOMMENDED**, that Defendant's Motion to Dismiss (Dkt. No. 43) be **DENIED** as to Plaintiff's Due Process claim; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

IT IS SO ORDERED

Dated: October 27, 2004
       Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge